As you know, in the record of this case, his successful career was ended precipitously by the corporation on April 18, 2000, when he was age 60. The reason for our appeal is that we strongly believe that the District Court, the Honorable Edward Lodge, erred when he found that there was insufficient evidence of pretext or insufficient evidence of discrimination to allow my client's claim to go to trial. As the Court knows, the District Court has a certain framework with which to review a motion for summary judgment, and Potlatch filed their motion, but I sincerely believe that Judge Lodge committed several errors in reviewing the evidence that was in the case. He did the things that this Court and the U.S. Supreme Court tells the District Judges that they are not to do. He pure and simply weighed evidence. He refused to draw inferences in favor of the non-moving party, my client, the plaintiff. He made credibility determinations and spun evidence in favor of the employer. He one by one went through any piece of evidence or arguable evidence that we submitted and disregarded it. He did not look at the cumulative effect, and he disregarded both direct and indirect evidence of pretext. The main issue of our appeal is on the pretext argument, but I think because our prima facie case was so strong that it's worthy of repeating, because as I understand the law, the U.S. Supreme Court in Reeves and this Court in Twong and others has said that if the prima facie case is strong enough, the plaintiff might not even need any more. We had more, and I'm going to go through that and how Judge Lodge disregarded it, but what I want to do is repeat the prima facie case. My client was clearly in the protected class under the Age Discrimination Employment Act. He was 60 years of age at the time that they came in and told him they had a package for him. There was nothing more that he was expected to or permitted to do for that corporation after 32 years of loyal service. There's no dispute that he was performing satisfactorily. In fact, one of the pieces of pretext that I'm going to point out is the performance review that was conducted for the preceding year. It was conducted on the end of February 2000, within six weeks of him precipitously being asked to leave his office. The adverse action, what was the adverse action? Well, one can say he was discharged, but in my view he was forced to retire. He had no option. He was forced to leave the workplace immediately. It was not his election. He was forced to retire, and that is counter to all the underlying principles of the ADA. And finally, he was immediately replaced by someone who was substantially younger, age 43, and who had inferior qualifications for the job. The person that replaced my client had no experience and no prior responsibilities over the Idaho Pulp and Paper Board Division, which is the division that Mr. Pottinger was the group vice president for at the time. I think that's an extremely strong prime facie case, and when you add to it the evidence that we've produced as pretext to the allegedly articulated legitimate business reason that Potlatch came forward with, I think it's readily obvious that the court erred. So what was our evidence of pretext? Well, I guess we have to start with what Potlatch's said. And in our brief, you may note we point out there were some shifting reasons, but let's take the reason that the court looked at and what Potlatch continues to come back to. And they say that the reason my client was asked to leave after 32 years of loyal service was that the president had lost confidence in him and his ability to turn the corporation around as they were going through some reorganizations and other things. My client heard, Mr. Pottinger, I do not believe you have the commitment to do what's necessary to make Potlatch successful. Well I'll tell you why I think that that articulated reason was pretextual, and there's a lot that it was announced. Potlatch didn't announce the next day that my client had lost the commitment to do what was necessary. They published to the entire organization without his consent, without his permission, a lie. They published that Mr. Pottinger had elected to take early retirement. And that's admittedly false. Would it have been better to say that he lost his I don't know. At least it would have been true. It wouldn't have been a lie. It would have been what they said. But I really don't quite understand why you think that shows some bad or malicious intent to try to put, make him look as good as possible. I think the reason it shows malicious intent is the fact that in the past, individuals who disappeared like that, that no longer had, that were immediately removed of their position, was because of some malfeasance or some misconduct, like sexual harassment. And both the president and CEO testified to that fact, that they had never before immediately replaced somebody for a reason that wasn't similar to malfeasance or misconduct. And then in the next word said that clearly that's not what my client had engaged in. They were not accusing him of malfeasance or misconduct. Right. But he's at a high level. And usually people at lower levels are removed for malfeasance or misconduct. But at the very highest reaches of corporations where Mr. Pottinger served with with doing important work for the company and supervising a lot of people, the standards can get more rarefied. And the CEO and the board can just say, you know, we think to run this vision, somebody who's going to approach it with a different a different way. But what do that based on age is correct teams. We're going to go in a different direction. And I don't see anything wrong with absolutely nothing. But, you know, when things don't go well, the guy on top tries to blame somebody. So the general manager blames the coach and everyone looks for somebody and say then they say we're going to do it differently. But we don't make that decision based on age. And it's clear we had other evidence. But you don't usually say what you do try to say is either by mutual decision or the person decided to leave or he's exploring other opportunities or some kind of you cover up what's happening. But but that's usually that try to protect the person who's being discharged, not to try to harm. Correct. And that did not happen in this case. For example, there was no transition period. There was no real. And, you know, sit down and let's discuss this. You know, Mr. Pottinger, this isn't going the way we need it to. And we think it's best that you work with us to put to groom somebody to put in your place or do those sorts of things. There's nothing impermissible with them doing that. But they didn't. And the reason they didn't. Could you go further with more evidence of pretext? Because so far I've got this particular point. I don't find it convincing for the reasons articulated in the questions that they're they seem to be trying to put a good face on. OK. And he may not appreciate the good face they tried to put on that and so on. But OK. And that's fair. And I'll hit the defamatory aspect of that because there's more evidence toward that. But the other thing is they both testified that they assumed when they gave this package to Mr. Pottinger, that he would accept it. They assumed it, which to me is stereotypical. You assume he's going to take it because he's 60 years of age. The same thing. That's why you can announce it the way you do. He's 60 years of age. They couldn't have announced it or probably wouldn't have announced it if he was 50 or even 55 on their own. They're not just going to say out of the blue, by the way, everybody in the organization. He, in fact, has elected early retirement. They couldn't do that. So to me, it's almost a stereotypical comment and a stereotypical conclusion that they made that obviously he was going to accept it. And he was going to go his own way. Just now. So I understand the dimensions of this. How much better was he better off? I assume he's better off with the retirement, the special package they want him to take to take early retirement than he would be if they terminated his employment. Correct. If they terminated him from for misconduct, he would not have received a term. Could they terminate him because it's an at will employment? Yes, that's how we without without any misconduct. Correct. And there he was entitled to an enhanced severance because it was an executive and they offered him a more enhanced severance. Consistent with the economic value. Let's just putting aside whether they're right to be terminating him or not. What's the economic value of the enhancement package? About three quarters of a million dollars. So, I mean, it could be the reason I don't put much weight in the announcement. That's false because he doesn't want to take the deal, as it turns out, as they may have just, you know, thought this is a good deal and he's going to take it. And I think that is what they thought that they thought he's going to take it because he's 60. But I mean, they're going to take it because it's three quarters of a million dollars. But they the way that they explain it and their assumptions and it was because of his age and welcome the opportunity to retire as if it was time for him to do that. And I think we were entitled to the inference of that, that evidence that they made this assumption that he was going to accept it. And when we talk about how much his argument has been more than that, he would take the early retirement. Did they say he was actually going to retire and not work anymore? Well, they said that he was being immediately replaced. And they the assumption that retirement doesn't necessarily mean you're not going to take another job. We even have judges who take retirement and then go off and become lawyers. But not allowing my client to be a participant in that decision so that it could have been announced and could have saved face. Then I think that is an issue. And I think they did it that way because of his age. And because they knew because of his age, in part, they could offer him the first point, then is that these circumstances in which he was. The termination occurred are unusual and show something that the the only way they could have approached it that way was age was a factor in that. And how are there other evidences to other high executives who were let go by the company and were handled differently? That there was in the record in the depositions discussion about different things. Some individuals were transitioned out even with the reduction in force. They were allowed to stay on for a couple of months after the reduction in force. At the level of Mr. Peterson, was it? Mr. Pottinger. He was at a high level. He was he was essentially third in the company. There aren't that many people in the company at the level he's at. He's like this is a company with multistate operations and some diverse, some different operations. He's sort of like the the CEO of the operation with the pulp in Idaho. Right. In Lewiston. The other evidence of pretext, the comments that were made less than five months before Mr. Pottinger was terminated. But the old team. Yes. The old with old ideas. You are an old management team. You have an old business model. And Mr. Paulson said that not only to my client, but to three other individuals who were also in the protected class age 56, 46 and 48. Now, Potlatch tries to put their own little spin on that. And the court accepted it. Well, old didn't mean old in the chronological sense. I believe that the judge deprived us of the inference that when he said old, he meant old and he meant old by virtue of age. And also in the Human Rights Commission proceeding, Potlatch described the word old to be entrenched, that he meant it as entrenched. And then later they changed it. Oh, this is some theory that we learned at the University of Michigan. Well, they can explain all that to a jury, just like I should. We should be able to explain that old meant old and that this was Paulson's problem with my client much earlier than on April 18th. He had a problem with him because he was old. And that is where he's protected by the age discrimination record about like the program from this Michigan seminar that everybody that a bunch of them went to. That shows the use of those phrases of management. The only thing there's a chart that has old on one sense and new on the other and attempts to diagram the various risks of of that. But again, the fact that Mr. Paulson interpreted a certain way and applied it to the circumstance and he went another step. He said, oh, great. This is my way to bring in the new power axis of the company. You're saying a summary judgment. You should get the inference that is ambiguous. And another inference I believe we get is from the use of the management committee members meetings of the word deadwood. And it's art. Yes, it's an ambiguous, ambiguous word. But Potlatch was saying, we are going to do what it takes as soon as we can to eliminate the deadwood deadwood normally. Maybe I'm not the best gardener in the world. I thought you could have deadwood on a on a young plant. That, you know, if a plant is a disease and part of it becomes dead or or there's some problem with the sunlight. In other words, I never thought of the word deadwood as implying old wood. Well, I think that, though, we were we were deprived of the inference and we're deprived of how it was used. And if you look up deadwood in the dictionary, does it suggest it's just more of something that's not growing, not alive. Right. Maybe we're getting we're within your five minutes. Could you talk a little bit about the reduction in force and your argument as to why have that? I support the pretext. I want to do that because I think inherent in that is potlatch was like, you know, the shell game. He was a member. He was part of the reduction force or maybe he wasn't. And then they say, well, he really wasn't part of the reduction in force. But we gave him all the same benefits of the reduction in force. And we followed the Older Workers Benefit Protection Act requirements that we had to to buy it, try to buy him out, basically have him sign a release and not sue us for age discrimination. There's no dispute that at the time my client was terminated, the reduction in force was underway. And in fact, again, at times they say, well, the one reason we terminated him is we wanted somebody new making decisions about who was going to be included in the reduction in force. Despite the fact that they had not seen my client's plan, didn't know what he was proposing. And that's admitted to in the record. He didn't have a written plan, though, right? He did have given them a written plan. He there had not been. They were not at that stage in the development. They just believed he wasn't going to be able to do what it was that they thought was necessary. Yet they didn't know what was necessary. And they didn't even ask him what he was planning. So, yes, there was no written plan ever given to him. But again, that to me, that's this assumption, this speculation that this man isn't going to be able to do it. Yet in this performance review, six weeks before, the president writes in his own language these strengths about Mr. Pottinger. He's smart. He knows the business. He's loyal to Potlatch. He has technical knowledge. He's an enthusiastic leader and he wants Potlatch to succeed. If that isn't evidence that the there is pretext to this, he lacks the commitment or they lack the confidence. I don't know what what is, because it's it's right within the same period of time. It's directly contrary to them. They're asserted articulated reason for what they what they did and many of them are saying that their reason is that he lacks. They don't think you can make hard decisions about something or, you know, take a new approach. Is that two people or three or what? That made the decision. It was the president who went to the CEO and they said, yeah, I think you're right. We you know, we need to make a change here. Now, with regard to the pretext, though, your theory, just to make sure I understand it, is that the evidence of pretext is showing that two people coordinated a pretext. No, I believe it was the president who just kind of got the wave in a 10 minute discussion in a hallway on April 12th. Yeah, go ahead with it. The same day that the human resource director for the corporation was explaining how they could do it and try to buy him out. So I think that's also evidence of pretext now with regard to the reduction in force. And I know you asked this and I kind of went around it a little bit. Reduction in force did occur in June and we presented statistics that if you were an age group of 60 and over, your chance of being losing your job was 50 percent or more. If you were in an age category under 40, your chances were approximately 10 percent. And those numbers don't even include my client and one of the other older managers who was asked to leave before the RIF as well. So I believe those statistics are probative. They were probative and they were valuable and the judge just dismissed him. And the reason he dismissed him was because he accepted Potlatch's claim that they were flawed because there wasn't a sufficient analysis of other factors that may have given rise to the statistics. However, Potlatch never came forward with their own statistics or an explication of what these factors were that would have correlated differently than the correlation with age. You're saying they blocked you in discovery from getting other factors to your. Yeah, they took the position that the performance evaluations were not part of the reduction in force process. That was alternative to their argument that the reduction in force that my client was not included in the reduction of force. So they chose to try to discredit our statistics, which they have every right to do. But that makes it a question of fact. And again, Judge Lodge went through the record and just just removed the ability for us to rely on any of those. So there are many other aspects of our what I believe is evidence of pretext or evidence of the discriminatory motive. I truly believe that the evidence suggests that there was a discriminating discriminatory motive more likely than not. And also that there is their reason is unworthy of credence. I have one other point, if I may ask how you respond to this. As I understand, the district court said that apart from whether the statistics were valid, that there is no showing that his termination was part of the RF. So if the RF was statistically weighted with ageism or something that there's no showing his termination was a part of the RF process. He he may have not been in the group that was told on June 5th or whatever, that they were part of the RF. But they explained it several times that he had the reason for his termination was because of the RF and leading to the RF. There was no consistent criteria. My client and probably nobody else, the potlatch was subjected to criteria consistent among all others of the RF. So I believe it's reasonable to say he was, in fact, part of the RF because of the connection in time. And regardless of that, those statistics are probative of other things. They are statistics. They are they are probative of what the company meant when they used that word. Let's eliminate the deadwood. This is what they did. This is, I guess, what they wanted my client to do was eliminate all these people who were in the protected class. I don't know, but I do think that we were deprived of the benefit of arguing to a jury that my client was part of the reduction in force. He was given the disclosure under the Older Workers Benefit Protection Act, like all the others. He was given offered similar severance benefits. So, again, I believe we were illegitimately deprived of the opportunity to argue there was a relationship there and there was probative value to the statistics. Thank you. Your Honor, Gerald C. Schaefer representing Potlatch Corporation. Your Honor, this case is about the termination of a high level group vice president at Potlatch Corporation. The decision to terminate the appellant, Mr. Pottinger, was made by the chairman of the board and CEO and by the president, who was also the chief operating officer. At the time of his termination, the plaintiff was 60 years old. At that time, the two senior officials of the company, the CEO and the president, were respectively 57 years old and 58 years old. Age was not a factor. But what is their age? You know, I'm not saying that you don't have a lot of other good arguments, but I don't see how their age proves that they're not engaging in age discrimination. I mean, if they decided, let's get rid of all the old persons because our company will make more profit, we'll have bigger dividends for shareholders. The fact that they were older wouldn't be a defense? Wouldn't preclude it, Your Honor. But the courts have recognized that when the termination is made by decision makers of similar ages, that that's a factor that's supposed to be an inference. We've said that, has the Ninth Circuit said that? That's in the Ninth Circuit case. It's in a brief, Your Honor. We say lots of things I don't agree with. And we would submit that that there is truly no evidence of pretext of age with respect to the reason given by the company for Mr. Pottinger's termination. There were no shifting explanations, no inconsistent explanation. Well, the only inconsistency is he got such a fine report and rating at the end of the year. Now, it was actually not a fine rating. He was he received what they call an M.R. Minus. M.R. stands for meets requirements and M.R. Minus means that he was doing something less than meeting requirements. Is there something higher than meets requirements? Yes. There's M.R. Plus. And then there's exceeds requirements or an E.R. The records would show that few people receive E.R.'s. His replacement, by the way, Craig Nelson, who was head of the Consumer Products Division, had received an M.R. Plus in the same rating period. And the E.R.'s are pretty rare in the company. That's correct. That's what the record shows. Now, it also shows that with respect to that performance evaluation that was delivered in February of 2000, that at that time, the president of the company, Richard Paulson, had reviewed the other performance evaluations that Mr. Pottinger prepared for his subordinates. And one of Mr. Paulson's reactions to that review was that with an operation, the Idaho Pulp and Paper Board operation, doing so dismally poor in terms of its productivity, in terms of its financial losses since 1997, they had lost 67 million, 64 million, 85 million, and were now losing 14 and a half million in the first quarter, that all of the performance evaluations that Mr. Pottinger had prepared of his subordinates, including those subordinates at the Idaho Pulp and Paper Board, were too glowing, too glowing for an operation which everybody in the company recognized was a drain on the operations of Potlatch. So this was one of the factors that was taken into consideration. It was one of the factors that support the conclusion of Mr. Paulson, the president, and Mr. Siegel, the chairman of the board, that Mr. Pottinger was not prepared to do the hard things to bring about a change in the operations of Idaho Pulp and Paper Board. This losing operation, so that rather than the performance review being inconsistent with his termination, there were factors about it that were clearly consistent, especially in view of the very difficult time that Potlatch was facing overall in those months in January, February, March, and April. I can see all kinds of plausible reasons, many of which you've sketched out right here. Probably the most prominent among them is that they've got three straight losing years, and they've now got a losing quarter, and they do what George Steinbrenner does when he's got a bad year, even though it's George's fault. He cans the manager. So I understand that if that were all we had, this would be a pretty easy case. The problem for you is that there may be something on the other side, and can you help me understand why you can get the summary judgment when you've got comments that say we're getting rid of the Deadwood, we're getting rid of the old management team with the old ideas? First of all, with regard to Deadwood, there's testimony in the record that Deadwood was interpreted by managers at Potlatch as meaning persons who were not performing. So there was no equation with age who could be not performing at any age. Furthermore, there's no common meaning or dictionary meaning that ascribes age to Deadwood. In terms of the old management team and the old business model, those do clearly come from the University of Michigan graduate training program, which was attended by the President Richard Paulson, by Charlie Pottinger, the plaintiff, and by other senior officials of Potlatch. And the evidence in the record shows graphs that indicate where the professor that did this training lined up the ideas of old and new. They did not refer to biological age, to the age of individuals. The words old and new referred to a management team that was had been in place for a long time. And they referred to a business plan that was either a new business plan or an old business plan. I understand all of that. And maybe maybe this is not something you can answer. It's something for us to decide. Those seem to me perfectly permissible inferences as to what those things might have meant. The problem is that they may not necessarily have meant that. And why don't we go to trial, therefore? Well, Judge Lodge concluded that at best those phrases were ambiguous. And he referred the two cases in the Ninth Circuit where they said that the language has to be clear to support the notion that this is an age-biased-related comment so that here the burden is on plaintiff, and so plaintiff has to carry the burden here in showing pretext. And the Ninth Circuit has recognized, for instance, that the words old boy network do not relate to age or biological age of the individual. They have another meaning. It's a colloquialism and all. So that that fits in with the idea of an old management team or an old business model. The program at Michigan was focused on change and obstacles to change and the need to make change to make significant change in order to correct management operations. The age correlation for the RIF, and I understand it was not part of the RIF, but why is the age correlation on the RIF not relevant evidence? The first, because Charlie Pottinger was not part of the RIF, and second, because as Judge Lodge found, the statistical evidence was not probative or admissible because it didn't take into account other factors. Now, it is not accurate that Potlatch deems that an error, meaning you admit it and then you pick it apart because you show how these are different. So what are the other factors? The other factors that were not taken into consideration and information which was produced to plaintiffs and therefore accessible to their statistician involved the location of the employees, the job classification of employees, the salary grade, high, low, medium of the employees. And all of those factors are normally factors that are taken into account before you can make a pronouncement about raw data only coming up with the conclusion that there was an impact on age, that you got to statistically account for other factors before you can. But why don't we test all that at trial? I mean, I understand that those are perfectly relevant factors and they may make that table disappear in terms of any probative factor against your client. Well, first, because this is a case about the termination of Charles Pottinger and Charles Pottinger was not part of that. Well, I understand that. But I think I find that particular one not very convincing. I shoot 10 people because I don't like the color of their skin. And then I fire somebody else who has the same color of skin. And you say, well, you shot those 10 and therefore it's irrelevant what your motivation might have been there. I mean, I have to say that merely because he was not formally part of the RIF doesn't make a motivation for firing a whole group of people irrelevant as to why he might have been fired here. The way that my explanation and the explanation that Judge Lodge used was the statistical evidence has to be admissible. And he determined that it was not admissible because it didn't take into account other factors which may have been the driving factors. Well, I think you're right or wrong, you're probably your best argument is based on a case, isn't it? I mean, what do the cases say about what you do with a survey that doesn't take into account certain factors? Do we have a law that says that that may not be considered or does it say that we can consider it? And then pick it apart at trial. There are two cases in the Ninth Circuit. One is Rose versus Wells Fargo, which was a RIF case and the individuals were part of the RIF. And the court found that the statistics that were provided by the plaintiff statistician didn't take into account other factors. Now, what the court in. And what did it do when it found that? Did it say that that was inadmissible for purposes of summary judgment? Yes. And it upheld the summary judgment of the individuals. And the court further said that you could attack the plaintiff's proffered statistics either on the basis of having an opposing statistician or by attacking the shortcomings of the statistics themselves. Now, in a more recent case, the case of Coleman, which is also a case that occurs recently and in the Ninth Circuit. The court again said that the statistics weren't concerning. First of all, the statistics that didn't explain away factors other than age were not of admissible value. And secondly, that statistics of the RIF were only admissible to the extent that the plaintiff, and there were three plaintiffs, I think, in the Coleman case, to the extent that the plaintiff was part of that RIF. So when they were using statistics of one RIF and the plaintiff, the third plaintiff, was actually caught up in a subsequent RIF, they said those statistics were not admissible with respect to that plaintiff. Both of those are Ninth Circuit cases. Thank you. I have nothing further. Thank you very much. Thank you. Yes. Would you comment on Coleman and also on the other cases you can. I believe that the Rose versus Wells Fargo case was a disparate impact case, which I think that the main attempt that we were using the statistics for Mr. Pottinger would be to as additional evidence of pretext on the disparate treatment claim. So I think that case can be distinguished Coleman. The reason that this court held that the statistics were not probative was the fact that the expert himself, who had been provided factors that the corporation was saying explained the outcome, explained the inference, that he didn't include those. He basically said, well, no, I'm not going to accept that correlation. I'm just going to accept the correlation with age. Here, Potlatch never put forth another correlation. They never said, well, if you look at these statistics based on location or if you look at them based on performance ratings or if you look at them based on this, then that inference goes away. So that is how Coleman is distinguishable, because in Coleman, I think the plaintiff made it made an error by saying, well, the plaintiff's expert said, well, I'll just we're just going to rely on this correlation. We're not going to rely, we're not, we're not going to acknowledge this other correlation that they in fact had made in the statistical analysis they'd done. Here in our case, we were never given, there was never an explanation proffered that would have basically disputed the inference that we have from the statistics that we had. And so how I've analyzed the statistical evidence in this case is similar to what you do with the other evidence when you have a disparate treatment case. In other words, are these statistics say the age was a factor in who was who was selected for the RIF? It's incumbent then on the defendant to articulate another explanation for those statistics. And they didn't do that. So I don't even think I had to do anything else. I think those were sufficient in and of themselves. Now, again, if we've got the opportunity to go to trial, they may be able to poke more holes in it. Maybe we'll have more information. But we were deprived of the opportunity to go to him and ask the court to admit them. Now, in Judge Lotta's ruling, he didn't say they weren't admissible. He just discounted it. And he didn't strike it from the record. So those statistics and our experts report are still in this record. The only other thing that I would like to add to the court. Well, there are two points. One is there was absolutely nothing in writing by this corporation of the reasons that they took this decision and made this decision 10 minutes in a hallway. And I know that doesn't say it had to do with his age, but I think it suggests that there was a motive different than just the goodwill of this corporation. Big companies decide a lot of things with tremendous importance in 10 minutes in a hallway. And I agree that gets you anywhere at all. It doesn't say anything about whether they did that because of age. They may have decided, let's go start an office in in Brussels in 10 minutes in the hallway. And I understand that. But it has been a very big and important point with my client. And I think I realize that I just don't see how that's probative. But the one last piece is that Mr. Schaefer, on behalf of Potlatch, wanted to mention that Mr. Nelson received a better performance rating than my client for the year end of 99. He didn't mention that Mr. Nelson, who was the replacement for my client, received a much lesser a meets minimum, which was on the verge of being fired in 1997 and was regarded the performance ratings. And this is in our briefing. There were others that received an in our M.R. minus and I believe one M.M. at the top at the end of ninety nine in a senior management level because this these ratings had applied to bonuses for senior managers. None of those. None of them were asked to disappear or to leave the organization. Thank you. Thank you very much. Case just argued will be submitted. Court will take a brief recess before the final case of a long morning. Thank you for a very good argument on both sides.
judges: Reinhardt, W Fletcher, Gould